IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MILLICENT CHANCELLOR | § | |
| | § | |
| V. | § | C.A. No. _____ |
| | § | |
| THE PRUDENTIAL INSURANCE | § | |
| COMPANY OF AMERICA | § | |

## PLAINTIFF'S COMPLAINT

This is a suit for damages and other relief by Millicent Chancellor against The Prudential Insurance Company of America. It is an action for breach of a disability insurance policy, violations of the Texas Deceptive Trade Practices Act, violations of the Texas Insurance Code, and damages.

### Parties

1.    Plaintiff Millicent Chancellor is a resident citizen of Houston County, Texas.

2.    Defendant The Prudential Insurance Company of America ("Prudential") is a foreign corporation licensed to do business and doing business in the State of Texas. is a domestic or foreign insurance company licensed to do business and doing business in the state of Texas. It can be served through its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201, or wherever it may be found.

### Jurisdiction and Venue

3.    This Court has jurisdiction over this civil action pursuant to 28 U.S.C. §1332(a)(1) since it is an action between citizens of two different states and the matter in controversy exceeds the sum of $75,000.

**Summary**

4.    Prudential is in the insurance business and sells various forms of life insurance, disability insurance, and health insurance. The promise of disability insurance is to provided income protection if an insured is disabled by injury or sickness.

5.    Implicit in the promise of the Prudential policy is that it will timely, fairly, and objectively adjust and pay a covered claim. If in doubt about the cause or nature of the insured's disability, Prudential implicitly promises to investigate the claim fairly and objectively and promptly pay if the claim meets the policy requirements.

6.    Before 2021, Ms. Millicent Chancellor submitted a claim for LTD benefits pursuant to her participation in the AICPA Insurance Trust, which LTD coverage was underwritten and insured by Prudential, pursuant to Plan NO. GZ-14273, and Plan Name AICPA Insurance Trust. She was assigned claim number 12772813 by Prudential. Her claim, which was predicated on a cognitive disorder which was likely resulting from a case of early onset dementia, was denied by Prudential in 2021. Prudential offered Ms. Chancellor a right to appeal the denial. she accepted the offer, and timely appealed the denial.  Prudential denied the appeal, leading to this lawsuit.

**Factual Background**

7.    Before 2014, Ms. Chancellor was a Vice President of Finance Operations at Halliburton. At that time, Halliburton was a global corporation with $29B in revenues from over 70 countries and at least 75,000 employees. Ms. Chancellor was responsible for a team of approximately 1,000 finance and accounting staff in

more than 40 countries with a budget of $93 million which supported Halliburton's global operations.

8.     In January 2014, Ms. Chancellor was terminated from her position at Halliburton based upon what her supervisor termed "deteriorating performance". The job had not gotten harder, but Ms. Chancellor was less efficient; she was working 10 to 12 hours a day but accomplishing substantially less than before. She had previously undergone brain scans and knew that scans done by her doctor revealed areas of deteriorating brain capacity. A mental examination showed that her mental acuity was also deteriorating. Despite her best efforts, her time at Halliburton had reached its end.

9.     This should not have been a surprise, as Ms. Chancellor had dealt with problems with her short-term memory since at least 2010. A 2011 Neuropsychological Examination showed generally intact cognitive functioning with reduced verbal comprehension, but a 2013 test revealed reduced processing speed and mild to moderate memory decline since 2011.

10.    Almost 2 years after her termination from Halliburton, Ms. Chancellor received a call from a headhunter who asked her to become the CFO of YES Prep Public Schools, Inc. to groom an existing staff person to become CFO. YES Prep was a growing public charter school system with approximately $100 million in revenues and 1,100 employees in Houston. The CEO and board members were excited to have Ms. Chancellor aboard.

11.    Ms. Chancellor did not take the job at YES Prep out of sympathy or accommodation – she took it because it represented a new, viable career path. She was hopeful that

because YES was much smaller than Haliburton, she could effectively perform the role of CFO. As the finance and accounting member of the executive team, her responsibilities included leading all aspects of YES Prep's financial management, working with the Board to ensure that YES was financially sound and capable of achieving its growth expectations, and ensuring that YES was a national model of effective financial management for public schools.

12. After several months, one of Ms. Chancellor's subordinates began to complain about a lack of leadership of the finance and accounting team. She rightfully pointed out that the long hours that Ms. Chancellor worked were not producing an outcome commensurate with the effort. Other issues were pointed out, such as Ms. Chancellor not comprehending the intricacies of the budget process and asking repeated questions about the loan application process. One of the other Operations executives complained as well. Despite Ms. Chancellor's long hours at the office, hard work, and dedication, the results did not come. Once again, Ms. Chancellor's mind was failing her.

13. This job should have been a 'cake walk' for someone with her experience, but the complaints were legitimate. Ms. Chancellor had difficulty concentrating long enough to complete tasks efficiently. To maintain her dignity, she informed the CEO of her plans to leave as soon as a replacement could be found.

14. A January 2018 Neuropsychological Examination showed marked deficits in memory. Dr. Rossetti diagnosed her with mild[1] neurocognitive disorder. But

---

[1] A "mild" cognitive disorder in the parlance of a Neuropsychological Examination reflects an inability of perform in the workplace. The next level of disorder above "mild" is severe and reflects an inability to safely take care of one's own activities of daily living.

because she could no longer work in her own occupation, Ms. Chancellor filed a claim for disability benefits. Office visits in 2019 revealed small vessel disease, memory loss, and fibromuscular dysplasia.

15. In February 2020, the Social Security Administration concluded that Ms. Chancellor had been disabled since December 2018.

16. Meanwhile, based upon its prior handling of Ms. Chancellor's claim for LTD benefits, Prudential was ready to delay or deny the claim, no matter the evidence. On August 30, 2020, it closed the claim because it contended that it did not receive an Attending Physician Statement.

17. In September 2020, Prudential employee Northansia Pacsan told Ms. Chancellor that the Social Security disability file was not enough to support her LTD claim.

18. In December 2020, almost two years after Ms. Chancellor stopped working, Prudential nurse employee Tanika Barrow claimed that the file lacked sufficient medical evidence to make a determination on work capacity or prognosis.

19. One month later, Prudential medical director Elana Mendelssohn reviewed some of the medical records. She concluded that Ms. Chancellor had no psychological or cognitive impairments that would keep her out of work. Based on that review, Prudential denied her LTD claim on February 19, 2021. The denial letter parrots Dr. Mendelssohn's conclusions.

20. In this claim, Prudential has ignored the evidence provided by Ms. Chancellor and her physicians supporting her disability. It has ignored the disabling nature of her memory problems. It has created an artificial distinction between subjective and objective evidence that is not supported by the policy, a distinction that has been

5

repeatedly criticized by courts around the country. It has relied on biased and unqualified medical record reviewers. All of the evidence provided by Ms. Chancellor showed that she met the policy's definition of disability.

21. Notwithstanding the foregoing, in June 2022, Prudential affirmed its denial of Ms. Chancellor's claim for benefits, requiring her to pursue this action to recover the benefits to which she is entitled.

22. As a member of the American Institute of Certified Public Accountants, Ms. Chancellor enrolled in the American Institute of Certified Public Accountants Insurance Trust's disability policy. The Group Policy "financial protection for you by paying a portion of your income while you have a long period of disability".

### Disabling Effects of Memory Problems

23. As part of her appeal, Ms. Chancellor advised Prudential that it had ignored her consistent and repeated memory problems. They were regularly documented byt her treating physicians and have only worsened with time. She has dealt with problems with her short-term memory since at least 2010. A 2011 Neuropsychological Examination showed generally intact cognitive functioning with reduced verbal comprehension. The 2013 exam revealed reduced processing speed and memory decline since 2011.

24. In January 2021, Dr. Vincenzo Virgadamo explained that the 2011 and 2013 exams documented generally intact cognitive functioning with reduced verbal comprehension and memory efficiency. The second exam revealed reduced processing speed. Her memory decline from 2011-2013 was indicative of a progressive memory impairment.

6

25.   More evidence of the progressive condition came in January 2018, when Dr. Rossetti diagnosed Ms. Chancellor with mild neurocognitive disorder. To the untrained eye, the exam may have appeared normal, as it also found high average in intellectual functioning. However, some cognitive abilities tend to be stable despite neurologic illnesses. The overall test result showed marked deficits in memory.

26.   In December 2020, Dr. McCauley also diagnosed Ms. Chancellor with mild neurocognitive disorder. He also compared the test to historical test results, which showed that Ms. Chancellor's high cognitive reserve masked the extent of her cognitive changes. Dr. McCauley also noted the isolated deficit in cognitive processing speed.

27.   Given this context, Prudential's wrongful denial of Ms. Chancellor's claim is demonstrated by the fact that Prudential's medical director refused to pick up the phone and speak with any of Ms. Chancellor's treating physicians. Instead, Dr. Mendelssohn wrote a letter to Dr. Virgadamo in January 2021, then dismissed her response. Prudential's deliberate conduct in this regard is yet another example of its desire to deny this claim., no matter the evidence.

**Prudential Ignores Subjective Evidence of Disability**

28.   In denying Ms. Chancellor's claim, Prudential repeatedly stated there was a "lack of clinical data", or no objective medical evidence, of Ms. Chancellor's disability. The term "objective medical evidence" is not defined in the Prudential policy. Courts have repeatedly rejected this artificial creation, whether it is found in policy language or simply grafted on *ex post facto*. An insurer cannot ignore subjective

7

complaints of memory problems, yet during the appeal it was pointed out to Prudential that it had done precisely that in its February 19, 2021 letter by stating "...while you may continue to report memory and cognitive symptoms, your file did not include specific measurements of your cognition".

29.   Courts have found it unreasonable for an insurer to reject (1) a claimant's self-reported evidence where there is no basis for believing it to be unreliable; and (2) a treating physician's notes recording plaintiff's "self-reporting and subjective observations, or other assertedly 'subjective' evidence, where, as here, the applicable Plan does not restrict the type of evidence that may be used to demonstrate disability."

30.   In the appeal, it was pointed out to Prudential that in creating an artificial distinction between subjective and objective evidence, Prudential had ignored Ms. Chancellor's repeated and consistent reports of memory problems. It does not directly accuse her of faking or lying about these conditions. It does not contend that her treating physicians are lying or exaggerating Ms. Chancellor's disability. Instead, it ignores them entirely. It cannot do so.

### Prudential Fails to Obtain Objective Evidence of Disability

31.   In denying the claim and appeal, Prudential relied exclusively on a medical record review from its own medical director, Dr. Elana Mendelssohn. Inexplicably, and rather in a self-serving manner, Dr. Mendelssohn found no objective testing that supported any functional limitations.

32.   Under the policy, Prudential has a contractual right to have Ms. Chancellor examined by a medical professional, but it chose not do so, and it has failed to

provide any reason why it failed to do so. As a fiduciary and insurer, Prudential has an obligation to look for coverage. This includes requesting appropriate tests and medical examinations when they are justified by the claim. When a claimant has suffered from memory problems for years, has provided several exams dealing with her memory problems, and the main source of her disability is her memory problems, an examination is appropriate.

33.    The decision to conduct a "file-only" review can raise questions about the benefits determination, especially when the right to conduct a physical examination is specifically reserved in the policy. Rather than repeatedly review the same medical records, Prudential had an obligation to have exercised its contractual right to have directed Ms. Chancellor to undergo an appropriate mental examination. Its outright refusal points to a desire to terminate the claim for its own benefit.

### Social Security Disability File

34.    The Prudential policy forces insureds like Ms. Chancellor to apply for Social Security Disability Income (SSDI) benefits, so that if benefits are approved, it reduces Prudential's financial obligation to Ms. Chancellor. The benefits she receives from the SSA Administration in account of a finding of her being disabled is a dollar for dollar offset from the benefit Prudential has to pay to Ms. Chancellor pursuant to the terms of its policy.

35.    In accordance with the instructions she received from Prudential, Ms. Chancellor applied for SSDI benefits. In February 2020, the Social Security Administration ("SSA") concluded that Ms. Chancellor had been disabled since December 2018. However, despite being requested to do so during the appeal of her claim denial,

and despite being authorized to do so, Prudential refused to obtain the actual SSDI file that evidences her disability. Prudential's actions in this regard are indicative of its desire not to have materials which would support an obligation to pay Ms. Chancellor's claim, but rather to focus on reasons why the claim is not payable.

36.     As pointed out to Prudential during the appeal, it was wrong for Prudential to role of the ostrich with its head in the sand, sitting by passively. It had a signed HIPAA authorizations from Ms. Chancellor. It knew how to get the SSA file. The SSA file shows that Ms. Chancellor is totally disabled from her own occupation. Prudential had an obligation to obtain the SSA file and fully and fairly review this evidence. It violated this duty to Ms. Chancellor in what is obviously an attempt to avoid having information in its file which would support her having a disability which would require Prudential to pay her claim.

### Prudential's Conflict of Interest

37.     Prudential is a fiduciary relating to the decision to pay claims for Ms. Chancellor's policy. Prudential has the fiduciary duty to treat claimants fairly and reasonably, conduct a full and fair review of claims, and act in claimants' best interests.

38.     However, Prudential operates under a structural conflict of interest inherent in its dual role as insurer and Claims Administrator. Not only is it the insurer of Ms. Chancellor's claim responsible for the payment of benefits, but its failure to pay this claim inures directly to its financial benefit. Prudential is motivated to deny this claim to obtain financial gain at the expense of Mr. Chancellor and other similar claimants. Its motivation is financial, instead of an honest, objective

adjustment of the claim in line with its fiduciary obligation. That financial gain is and has been obtained in various ways.

39.     Prudential reserves funds for pending claims. It reserved funds for Ms. Chancellor's claim after she filed it, and it continues to reserve funds for her LTD claim. Those reserved funds are not idle but are instead invested as with other funds available to Prudential for additional revenue. Recognizing the likely long delay before a claim is resolved, Prudential enjoys the financial gain of the investment income and financial return as an additional source of revenue and profit. This is another example of its financial conflict of interest.

40.     But Prudential makes it even worse by providing its claims personnel, including those in claims management and those involved in the adjudication of Ms. Chancellor's claim, with monetary incentives to delay payment or deny disability claims. Prudential employees get bonuses based on specific employee metrics contained in their semiannual and annual reviews. Some of them also get stock bonuses.

41.     That conflict of interest and financial motivation to deny this claim was one of the motivations for Prudential to deny this claim.

**Prudential's Medical Director is Biased and Unqualified**

42.     Prudential's motivations are also found in its choice of medical reviewers in this claim. In denying Ms. Chancellor's claim, Prudential relied on its medical director, Elana Mendelssohn, to give its denial the sheen of credibility. However, Dr. Mendelssohn has little to no credibility, and her opinions should not be given any weight. She has never met or treated Ms. Chancellor.

43.  Courts around the country have made known their issues with Dr. Mendelssohn's lack of credibility and bias for years. See *Smith v. Bayer Corp. Long Term Disability Plan*, 275 F.App'x 495, 506 (6th Cir. 2008); *Weidauer v. Broadspire Servs., Inc.*, 2008 WL 475891 (S.D. Ohio Oct. 27, 2008) ("Peer reviewer Dr. Mendelssohn concluded that there were no findings or observations to substantiate the presence of cognitive, emotional or behavioral impairments. Yet, there was."); *Carey v. BellSouth Short Term Disability Plan*, 2008 WL 178714 (N.D. Ga. Jan. 17, 2008) ("At least one of these peer reviewers--Dr. Mendelssohn--may have lacked objectivity, and, according to the uncontroverted affidavit of Dr. Grumet, Dr. Mendelssohn was unobjectively antagonistic to Dr. Grumet's diagnosis and opinion that Carey was disabled. This antagonism interfered with an objective, fact-based assumption of her condition."); *Stephens v. Aetna Life Ins. Co.*, 2012 WL 2711378 (S.D. Ohio July 9, 2012); *Neubert v. Life Ins. Co. of N. Amer.*, 2012 WL 776992 (N.D. Ohio Mar 8, 2012); *Carrier v. Aetna Life Ins. Co., Ca. No. 14-03932 BRO (C.D. Cali., July 24, 2015) ("the Court finds Dr. Corrado's* conclusions more reliable than Dr. Mendelssohn.")

44.  In Ms. Chancellor's claim, Dr. Mendelssohn concluded that Ms. Chancellor had no psychological or cognitive impairments that would keep her out of work.  Not only did Dr. Mendelssohn question the medical conclusions of Ms. Chancellor's treating physicians, she went further and accused them of medical malpractice.

45.  Dr. Mendelssohn's opinions are simply evidence of her bias and lack of credibility. They hold no weight at all. Relying on the biased opinion Dr. Mendelssohn is a

breach of Prudential's fiduciary duty to investigate, adjust, and pay or deny claims in good faith fully, fairly, and objectively.

## CAUSES OF ACTION

### Breach of the Insurance Contract

46.  Plaintiff incorporates the preceding factual allegations.

47.  At all material times, the policy was in full force and effect. All the premium payments were timely paid by Plaintiff. Plaintiff provided Prudential with the information and evidence needed to properly pay her disability claim. However, Prudential breached its duty under the insurance policy by failing and refusing to properly pay the disability claim and office overhead claims, as well as the 2020 office overhead claim.

48.  The damages include the unpaid monthly disability benefits of $3,000 per month from 2018 through the present, which total $45,000 as of June 2022. Her damages are ongoing, as she remains disabled under the policy.

### Breach of Duty of Good Faith and Fair Dealing

49.  Plaintiff incorporates the preceding factual allegations.

50.  Insurers have an affirmative common law duty of good faith and fair dealing. That means that in the handling and adjustment of a claim, the insurer is obligated to act in good faith and deal fairly with the policyholder in delivering on the promise of the policy. Prudential was obligated to meet this common law obligation once a claim on the policy was made.

51.  The guiding principles of proper claims handling help ensure the insurer meets this obligation. Claims handling personnel must be adequately trained on these

principles. These principles include an obligation to promptly acknowledge the claim, timely investigate the claim, and adjust that claim in a fair, objective, and non-biased manner.

52.     Timely adjustment and investigation of claims means seeking information and evidence to answer questions raised that may clarify the insurer's obligation to pay or deny the claim. Traditional claims handling principles also include a responsibility to find coverage, err in favor of the insured, resolve ambiguities and doubt in favor of the insured, and pay the claim if it meets the policy requirements for payment.

53.     An objective and thorough investigation includes inquiry into reasons to pay a claim, along with any reasons to deny the claim. The insurer must look at the positive and negative before making its claim decision. Claims decisions must be based on facts, not guesses or speculation. Artificial obstacles to payment, unreasonable interpretation of policy terms, speculation, outcome-oriented investigations, and bias should pay no role in delivery on its promise. In following these principles, the insurer is positioned to deliver on the promise of the policy. It is also positioned to meet its obligation of good faith and fair dealing.

54.     Prudential and its claims personnel failed to follow these claims handling principles. Its adjusters, on information and belief, lacked the requisite training to properly investigate and adjust this claim. They further failed to adjust this claim in a fair and equitable manner. They ignored their responsibility to find coverage or err or resolve doubts in favor of the insured and resolve ambiguities in favor of the insured. They failed to investigate and evaluate this claim objectively and fairly.

They merely looked for a reason to deny, ignoring reasons to pay the claim. Prudential was fully aware of and endorsed this conduct. In addition, Prudential and its adjusters failed to acknowledge Ms. Chancellor's mental and physical condition and instead denied this claim solely based on guesswork and speculation.

55.    Throughout this claim, Prudential utterly failed to acknowledge in its communications with Plaintiff that it had the affirmative duty to look for coverage, assist her with her disability claim, and get the proper documents to determine if her 2012 disability claim and office overhead claims should have been approved or continued. Instead, Prudential presumably began and ended its investigation and adjustment of this claim with the lackadaisical approach evinced by biased medical personnel like Dr. Mendelssohn. In doing so, it sought to find support for its conclusion that Ms. Chancellor's disability claim should be denied. terminated. This was the sole focus of any investigation Prudential undertook. It was an outcome-oriented focus seeking to find a reason for denial.

56.    In addition, Prudential treated this claim as if it were governed by ERISA, despite knowing that Ms. Chancellor participated in the AICPA Insurance Trust.[2]

57.    Proper claims handling conduct requires the insurer, among other things, to work with the insured to find coverage. In this case, Prudential worked only to find reasons to deny claims and underpay claims. Coverage could have easily been found if Prudential fully and fairly reviewed the evidence submitted by Ms.

---

[2] The AICPA Trust is an insurance policy available only to CPAs.

Chancellor from August 2018 through her appeal. Doing so would have led to only one conclusion: that her disability claim was covered. Prudential's liability as of the time of its denial was thus reasonably clear.

58.  This conduct was a breach of its common law duty of good faith and fair dealing. Prudential had a duty to investigate, evaluate, and adjust Plaintiff's claim fairly, objectively, and thoroughly. In this instance, its denial was made without any reasonable basis. At all material times, Prudential's liability was reasonably clear.

59.  Ms. Chancellor relied on Prudential to investigate and adjust her claims in good faith honestly, objectively, and fairly. That reliance has been to her detriment. Prudential's breach of its common law duty of good faith and fair dealing instead caused Ms. Chancellor to suffer considerable emotional distress and mental anguish. This conduct further caused injury and damage, for which Ms. Chancellor further sues.

### Violations of the Texas Insurance Code

60.  Plaintiff incorporates the preceding factual allegations.

61.  The Texas Insurance Code prohibits, among other things, certain activity by an insurer in the handling and adjustment of claims for policy benefits. Its focus is on the insurers claims handling conduct. Prudential, in its handling and adjustment of Plaintiff's claim, has engaged in just such prohibited unfair insurance claims practices in violation of Chapters 541 and 542 of the Texas Insurance Code. These unfair practices have also been committed knowingly. Prudential has committed, *inter alia*, the following unfair claims settlement practices:

16

i.   Misrepresenting material facts or policy provisions relating to the coverage at issue;

ii.  Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the Chancellor claim when its liability was reasonably clear;

iii. Failing to promptly provide to Ms. Chancellor a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for its denial of a claim or offer of a compromise settlement of a claim;

iv.  Failing within a reasonable time to affirm or deny coverage of a claim to Ms. Chancellor ;

v.   Refusing to pay a claim without conducting a reasonable investigation of the claim;

vi.  Knowingly misrepresenting to Ms. Chancellor pertinent facts or policy provisions relating to coverage at issue;

vii. Failing to acknowledge with reasonable promptness pertinent communications relating to the claim arising under the policy;

viii. Making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact, and failing to state those material facts necessary to make other statements made not misleading, considering the circumstances under which the statements were made;

ix.  Not attempting in good faith to effect a prompt, fair, and equitable settlement of a claim in which liability has become reasonably clear; and

x.   Engaging in this conduct knowingly with actual knowledge of the falsity, unfairness, or deception of these foregoing acts and practices.

62.   At no time before this suit was filed did Prudential make any attempt, in good faith or otherwise, to settle Ms. Chancellor's claim. Though it received the appeal, which clearly and unequivocally stated the facts in support of coverage of the claim, Prudential chose to ignore the facts. It chose to ignore the evidence. It chose to ignore the equitable bases for coverage. Its liability was reasonably clear. Failing

to try to promptly, fairly, and equitably settle this claim was a further violation of the Insurance Code provisions.

63. At all material times, Prudential's conduct in this regard was intentional. It knowingly engaged in this conduct. It knew it had no factual basis upon which to deny Ms. Chancellor's claims. Instead, it intentionally chose to ignore the factual and legal evidence provided by Ms. Chancellor. It chose to parrot its flawed reasoning, perform no investigation, not offer a single penny, and hope that Ms. Chancellor would simply go away.

64. This conduct, along with Prudential's other acts and omissions, violated Texas Insurance Code §§541.001, et seq., 542.001, et seq., including the Insurance Code's provision for the prompt payment of claims, §542.051, et seq.

### Prudential's Deceptive Trade Practices

65. Plaintiff incorporates the preceding factual allegations.

66. Prudential has also violated the Texas Deceptive Trade Practices - Consumer Protection Act, §§17.46, et. seq. by its misrepresentations and by engaging in, *inter alia*, false, misleading, or deceptive practices, unconscionable conduct, and engaging in acts or practices in violation of the Tex. Ins. Code Ann. §541.001 et seq. It was unconscionable for Prudential to blindly rely on medical record reviewers lacking the appropriate education, training, or experience in areas of medicine relevant to the claim.

67. Prudential's motivations are also found in its choice of medical reviewers in this claim. In denying Ms. Chancellor's claim, Prudential relied on its medical director, Elana Mendelssohn, to give its denial the sheen of credibility. However, Dr.

Mendelssohn has little to no credibility, and her opinions should not be given any weight. She has never met or treated Ms. Chancellor.

68. Courts around the country have made known their issues with Dr. Mendelssohn's lack of credibility and bias for years. See *Smith v. Bayer Corp. Long Term Disability Plan*, 275 F.App'x 495, 506 (6th Cir. 2008); *Weidauer v. Broadspire Servs., Inc.*, 2008 WL 475891 (S.D. Ohio Oct. 27, 2008) ("Peer reviewer Dr. Mendelssohn concluded that there were no findings or observations to substantiate the presence of cognitive, emotional or behavioral impairments. Yet, there was."); *Carey v. BellSouth Short Term Disability Plan*, 2008 WL 178714 (N.D. Ga. Jan. 17, 2008) ("At least one of these peer reviewers--Dr. Mendelssohn--may have lacked objectivity, and, according to the uncontroverted affidavit of Dr. Grumet, Dr. Mendelssohn was unobjectively antagonistic to Dr. Grumet's diagnosis and opinion that Carey was disabled. This antagonism interfered with an objective, fact-based assumption of her condition."); *Stephens v. Aetna Life Ins. Co.*, 2012 WL 2711378 (S.D. Ohio July 9, 2012); *Neubert v. Life Ins. Co. of N. Amer.*, 2012 WL 776992 (N.D. Ohio Mar 8, 2012); *Carrier v. Aetna Life Ins. Co., Ca. No. 14-03932 BRO (C.D. Cali., July 24, 2015) ("the Court finds Dr. Corrado's* conclusions more reliable than Dr. Mendelssohn.")

69. In this claim, Dr. Mendelssohn concluded that Ms. Chancellor had no psychological or cognitive impairments that would keep her out of work. Not only did Dr. Mendelssohn question the medical conclusions of Ms. Chancellor's treating physicians, she went further and accused them of medical malpractice.

70.     Dr. Mendelssohn's opinions are simply evidence of her bias and lack of credibility. They hold no weight at all. Relying on the biased opinion Dr. Mendelssohn is a breach of Prudential's fiduciary duty to investigate, adjust, and pay or deny claims in good faith fully, fairly, and objectively.

71.     Prudential's conduct as demonstrated in this action is not isolated to this claim. On information and belief, this conduct is part of a common pattern and common practice toward other policyholders like Ms. Chancellor with individual disability policies who submit disability claims. These misrepresentations and mischaracterizations of an insured's regular occupation is unconscionable, particularly since Prudential's victims are disabled people already struggling with physical and emotional disabilities.

72.     Ms. Chancellor bought the Prudential policy to give her peace of mind if she became disabled and unable to work. Prudential took away that peace of mind. Ms. Chancellor relied on Prudential to investigate and adjust their claim in good faith honestly, objectively, and fairly. That reliance has been to her detriment. Prudential's misrepresentations and unconscionable conduct instead caused Ms. Chancellor to suffer considerable emotional distress and mental anguish. This conduct further caused injury and damage to Plaintiff, for which she further sues.

### Knowing Conduct

73.     The conduct complained of in this action was engaged in knowingly, as that term is defined in Ch. 17 of the Texas Business and Commerce Code and Tex. Ins. Code §541.001(1). Prudential knew what it was doing. It knew its claims handling

conduct violated provisions of the Texas Insurance Code. It knew of its false, misleading, and deceptive nature conduct in handling this claim.

## Damages

74. Prudential' s acts, omission, and practices constituting a tort were the proximate cause of Plaintiff's damages. All of Prudential's acts and practices in violation of the various statutes herein recited were the producing cause of Plaintiff's actual damages, including, but not limited to, damages for mental anguish and emotional distress, as well as actual damages under the insurance contract. For these wrongful acts, omissions, and practices, Plaintiff is entitled to money damages as may be found by the jury.

75. The acts, omissions, and practices of Prudential constituting a tort herein warrant the imposition of 18% per annum pursuant to Tex. Ins. Code §542.060, *et seq*.

76. Prudential's actions in handling of Plaintiff's claim were done knowingly and intentionally, or with a conscious or callous disregard for Ms. Chancellor's rights and welfare. As such, its actions reflected gross negligence and were so outrageous as to warrant the imposition of punitive or exemplary damages, for which Plaintiff further sues for recovery. Plaintiff seeks such punitive or exemplary damages as may be assessed by the jury in its discretion.

77. Plaintiff also requests, in addition to the amount of benefits withheld, prejudgment interest on any such award. she is entitled to prejudgment interest as additional compensation, and pursuant to Tex. Ins. Code §1103.104, or on principles of equity.

## Request for Attorneys' Fees

78.    This suit was made necessary by Prudential's wrongful acts and practices. Plaintiff has been forced to retain attorneys to prosecute her claims, for which she has agreed to pay a reasonable attorneys' fee. In this regard, she is entitled to recover her reasonable attorneys' fees and expenses incurred and to be incurred in this action for the full prosecution of this claim through trial and appeal, if any, that are reasonable and necessary for her to obtain the relief she seeks. Accordingly, Plaintiff further seeks recovery of her reasonable attorneys' fees incurred and to be incurred in the prosecution of this action pursuant to pursuant to Section 38.001, *et. seq*. of the Texas Civil Practice and Remedies Code,  Ch. 541 and 542 of the Texas Insurance Code, Section 17.49 *et seq*. of the Business and Commerce Code, and any all other applicable Texas law.

## General Claims

79.    All notices required to be given have been given, and all conditions precedent have been satisfied.

80.    Plaintiff requests prejudgment interest at the maximum rate permitted by law, including that permitted pursuant to Tex. Ins. Code §542.060 and §1103.104(c), or the maximum rate permitted in equity.

## Demand for Jury Trial

81.    Plaintiff demands a jury trial.

## Prayer

For these reasons, Plaintiff requests Prudential be cited to appear, and on final trial, Plaintiff obtain a judgment against Prudential in an amount in excess of the minimum jurisdictional limits of this Court, Plaintiff be awarded judgment against

Prudential for the above described damages in the full amounts allowed by law, together with statutory interest, reasonable attorneys' fees incurred herein, pre-judgment and post-judgment interest at the maximum rate allowed by law, costs of court, and all such other and further relief, both at law and in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

By:_____*/s/ Amar Raval*_____

Amar Raval, TBA #24046682
Berg Plummer Johnson & Raval LLP
3700 Buffalo Speedway, Suite 1150
Houston, Texas 77098
(713) 526-0200
(832) 615-2665 (Fax)
araval@bergplummer.com

Glenn R. Kantor, California Bar #122643
Kantor & Kantor, LLP
19849 Nordhoff Street
Northridge, California 91324
(818) 350-6250
(818) 340-6272 (Fax)
gkantor@kantorlaw.net

(*pro hac vice* application pending)

ATTORNEYS FOR PLAINTIFF